1
2
3
4
5
6
7
8            IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MANUEL PRIMAS,

11            Petitioner,                No. CIV S-05-1557 MCE KJM P

12        vs.

13   RICHARD J. KIRKLAND, et al.,

14            Respondents.          FINDINGS & RECOMMENDATIONS

15   _____/

16            Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges his 2002 conviction on charges of

18   first degree murder and attempted robbery, with enhancements for being armed with a firearm

19   and suffering a prior serious "strike" felony conviction.  He seeks relief on the grounds that his

20   conviction was obtained through a confession that resulted from an unlawful custodial

21   interrogation and that the trial court erred in denying his repeated motions for substitute counsel.

22   Upon careful consideration of the record and the applicable law, the undersigned will

23   recommend that petitioner's application for habeas corpus relief be denied, for the reasons set

24   forth below.

25   /////

26   /////

1

I. <u>Background</u>[1]

   Separate juries convicted Mario Pierre Hall and Manuel Hartman Primas of crimes arising out of a botched robbery of a drug dealer. Hall's jury found him guilty of first degree murder and attempted robbery and sustained a robbery-murder special circumstance and firearms allegations.  (Pen.Code, §§ 187, 190.2, subd. (a)(17, 211/664, 12022.53(b), (c) & (d).)  Primas's jury found him guilty of first degree murder and attempted robbery, and sustained firearm allegations; the trial court found he had a serious felony prior which qualified as a strike.  (Pen.Code, §§ 187, 12022, subd. (a)(1), 211/664, 667, subds. (a), (b)-(I).)  The trial court imprisoned Hall for life without parole plus 25 years to life, and Primas for 56 years to life, and imposed various fines on each conviction.  Each timely appealed.  We shall direct minor changes to some monetary orders and otherwise affirm each judgment.

FACTS

<u>Evidence Given to Both Juries</u>

Hall, Primas and Eddie Watts tried to rob drug dealer "Big Rick" Collier in a Franklin Villa alley on the evening of December 10, 2000; Collier was shot dead.  Watts pleaded guilty to manslaughter and was not tried with the others.

Veronica Edwards, Collier's companion and mother of their children, went shopping with him that evening and he received a call on a mobile phone; later they went to a market where he spoke with a friend; he then told her he wanted to go to a house on G Parkway to collect some money.  Edwards knew Collier had a lot of money on him.  When she stopped her car by the house, a man got in and directed them to an alley.  The man came out of a house and approached a shorter man.  Collier got out of the car, spoke to the men, then they all went to a different alley between El Limon and G Parkway.  Edwards heard Collier's voice, then heard gunshots, then saw people scattering.

Shayron Savoy lived nearby upstairs and heard someone in the alley say "'Give me everything.'"  He saw a dark-complected man with a beanie over his face approach Collier.  Collier told the man "'I don't have nothing.  What is this for?'"  Collier began to walk backwards, then Savoy saw the man with the beanie point a gun and shoot.  Collier apparently pitched forward onto the shooter; as the shooter struggled to get out from under him and escape, he lost his beanie.  In a pretrial videotaped statement, Savoy told an officer

---

   [1]  This statement of facts is taken from the November 9, 2004 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pages 1 to 7, filed as Lodged Document 3 in support of the Answer.

2

that Collier tried to grab the gun from the robber before the first shot, they went to the ground, then as they struggled on the ground he heard more shots. Savoy had said Primas was nearby and ran off after the shooting. He said neither Watts nor Primas was the shooter. Later he identified a picture of Hall as resembling the shooter, but he was not certain.

William Mosley saw the shooter pointing a .38-caliber revolver at Collier and ordering him to the ground; Collier said he was going home. Mosley saw Collier "tussling" with the shooter, then he heard shots.

Bobby Barksdale testified Primas asked for and was given a scale that day, about one hour before Barksdale heard Collier had been shot. In a pretrial statement, he had said that 15 to 20 minutes before he heard Collier had been shot, Primas asked for the scale "because he was going to buy some weed from Big Rick."

DNA evidence showed that Hall had worn the beanie found near Collier.

Collier was shot three times at near-contact range. Two wounds were not serious, but a head wound caused by a bullet in the .38/.357-caliber class was fatal; another wound was from a similar bullet but only a fragment of the third bullet was found.

Telephone records showed several calls from Watts's mobile telephone to Collier's home and mobile telephones on the night of the murder.

Hall testified at trial and claimed he had carried a small .22-caliber gun and had agreed to take part in the robbery. He claimed "it was supposed to happen in the townhouses. But I had agreed to it at first to do it in townhouses, but I never did it. I seen ... Big Rick pull up, and I just didn't do nothing. I started walking off from it." When the others pulled up in the car he told them he was "cool. I am not going to do this." The beanie had been his (explaining the DNA) but Watts wore it for the robbery. On cross-examination the following took place: "Q. So then you and Mr. Watts are standing over kind of across from where you see Mr. Primas and Mr. Collier talking, and you are having this conversation about how you don't want to be involved, right? A. Yeah. Q. And you give Mr. Watts your hat, right? A. Yeah." He watched Watts walk up to Big Rick and Primas: "I seen him [Watts] with the gun pointing it. I seen Manuel get on the ground. I seen Rick throw something and send him back up and Bono was still on him and I just seen him rush. I heard the gun go off and I left." He claimed Watts carried a revolver, like the .38-caliber revolver described by the People's expert as the likely murder weapon (and like the one Moseley saw), and that his own gun had not been fired that night. His only role was that "I heard shots and I seen the tussle, part of a tussle."

3

Hall called James Your to testify.  He had been in prison with Watts, who sought his help to rob Collier.  Watts planned to call Collier to set up a drug deal, then "jack" him using ski masks.  According to Your, Watts thought Collier would be "an easy lick."

Evidence Given to Primas Jury Only

Adesina Hicks, Primas's former girlfriend, testified he told her he was going to call Collier and ask him to bring marijuana ("zips", from Ziploc® bags) to G Parkway, where two of Primas's friends would fight Collier, so Primas could take marijuana to make up for short amounts on past deals.  Primas was nervous when he came home later and when she asked why he said "I didn't do it, that's all you need to know."  Later he told someone on the telephone to get rid of the beanies.  Primas later told her Hall and Watts confronted Collier, who resisted; when Hall's beanie came off, Hall had to shoot him.  Collier's response was unexpected because Primas had thought he was a "poodle."

In an interrogation Primas told police the plan had been to commit a strong-arm robbery with no guns.  Primas admitted calling Collier to buy marijuana, and said he went to get a scale from Barksdale and he and Collier began to weigh the marijuana.  When Hall approached with a gun, wearing a mask, Primus [sic] "laid down," i.e., went to the ground, and saw Collier backing up before Primus [sic] heard shots and screaming.  Hall told Primas he killed Collier with a .38-caliber gun.  After the event Primas saw both Watts and Hall with guns.

Primas rested without presenting any evidence.

Evidence Given to Hall Jury Only

Barksdale had been in custody with Hall and told police Hall had told him he (Hall) had a .22-caliber gun, Collier rushed him, and "when he was on the ground, uh, tussling with Big Rick, he heard two shots and got up and ran."  Hall had said he was trying to rob ("jack") Collier for drugs ("a few zips or something").

In an interrogation Hall told police he had been with Primas and Watts at a liquor store earlier that evening, but that he knew nothing about the robbery.  He had heard rumors linking him to the crime.  In a later interrogation he admitted he knew of the plan to rob Collier and had agreed to take part.  They planned to do it by a townhouse, but apparently missed Collier, and then went to meet him in the second alley.  When Hall accosted Collier, Collier demurred and rushed him, after which Hall's .22-caliber gun accidentally fired but the shot did not hit Collier.  While Hall struggled with Collier, he heard gunshots.  Watts had a revolver, but Primas had no gun.

4

1   II.  Standards for a Writ of Habeas Corpus

2            An application for a writ of habeas corpus by a person in custody under a

3   judgment of a state court can be granted only for violations of the Constitution or laws of the

4   United States.  28 U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any

5   claim decided on the merits in state court proceedings unless the state court's adjudication of the

6   claim:

7            (1) resulted in a decision that was contrary to, or involved an
             unreasonable application of, clearly established federal law, as
8            determined by the Supreme Court of the United States; or

9            (2) resulted in a decision that was based on an unreasonable
             determination of the facts in light of the evidence presented in the
10           State court proceeding.

11   28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").[2]  It is the habeas

12   petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See

13   Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

14           The "contrary to" and "unreasonable application" clauses of § 2254(d)(1)  are

15   different.  As the Supreme Court has explained:

16           A federal habeas court may issue the writ under the "contrary to"
             clause if the state court applies a rule different from the governing
17           law set forth in our cases, or if it decides a case differently than we
             have done on a set of materially indistinguishable facts.  The court
18           may grant relief under the "unreasonable application" clause if the
             state court correctly identifies the governing legal principle from
19           our decisions but unreasonably applies it to the facts of the
             particular case.  The focus of the latter inquiry is on whether the
20           state court's application of clearly established federal law is
             objectively unreasonable, and we stressed in Williams [v. Taylor,
21           529 U.S. 362 (2000)] that an unreasonable application is different
             from an incorrect one.

22

23   Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

24

_____

25       [2]  Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not
     grounds for entitlement to habeas relief.  Fry v. Pliler, 551 U.S. 112, 127 S. Ct. 2321, 2326-27
26   (2007).

1  law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply
2  fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8
3  (2002).

4           The court will look to the last reasoned state court decision in determining
5  whether the law applied to a particular claim by the state courts was contrary to the law set forth
6  in the cases of the United States Supreme Court or whether an unreasonable application of such
7  law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.
8  919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial
9  of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court
10 must perform an independent review of the record to ascertain whether the state court decision
11 was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other
12 words, the court assumes the state court applied the correct law, and analyzes whether the
13 decision of the state court was based on an objectively unreasonable application of that law.

14          It is appropriate to look to lower federal court decisions to determine what law has
15 been "clearly established" by the Supreme Court and the reasonableness of a particular
16 application of that law.  "Clearly established" federal law is that determined by the Supreme
17 Court.  Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is
18 appropriate to look to lower federal court decisions as persuasive authority in determining what
19 law has been "clearly established" and the reasonableness of a particular application of that law.
20 Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th
21 Cir. 2003), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo,
22 365 F.3d at 782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of
23 Supreme Court precedent is misplaced).
24 /////
25 /////
26 /////

6

1    III.  Petitioner's Claims

2            A.  Admission of Petitioner's Confession at Trial

3            Petitioner's first two claims challenge the admission into evidence of his

4    statements to police, which were obtained during the course of two separate interviews.  He

5    argues that his interrogations were conducted in violation of Miranda v. Arizona, 384 U.S. 436

6    (1966), and his Fifth Amendment right to remain silent.  (May 19, 2006 Amended Pet.

7    (hereinafter Pet.) at 5 & Ex. A at 2.)  Petitioner contends he "repeatedly stated I didn't want to

8    talk, but the interview continued."  (Id.)  He also claims that the questioning was "relentless" and

9    that the second interrogation violated the "no recontact rule" of Edwards v. Arizona, 451 U.S.

10   477 (1981).  (Id., Ex. A at 2, 3.)

11            1.  State Court Ruling

12            The California Court of Appeal rejected petitioner's claims regarding the

13   admission of his inculpatory statements, reasoning as follows:

14       II. Primas's Pretrial Statements

15       "The business of police detectives is investigation, and they may
         elicit incriminating information from a suspect by any legal
16       means.... 'The courts have prohibited only those psychological
         ploys which, under all the circumstances, are so coercive that they
17       tend to produce a statement that is both involuntary and
         unreliable.'"  (People v. Jones (1998) 17 Cal.4th 279, 297-298
18       (Jones).)  Deceit is permitted, if it is not of the kind likely to
         produce untrue statements.  (Id. at p. 299.)
19
         The trial court excluded from the People's case-in-chief statements
20       Primas made to detectives on December 29, 2000, and because
         Primas did not testify those statements were never introduced for
21       impeachment.  The People did introduce evidence of statements
         Primas made on January 3, 2001.  Primas admitted helping with
22       the robbery plan, although he claimed no guns were supposed to be
         used.
23
         Primas was arrested on December 29, 2000, for violating parole
24       and possessing cocaine.  Detective Woodward interviewed him
         that day but did not Mirandize him.  Primas said he had heard
25       rumors of his involvement but "I ain't did nothing.  I ain't killed
         nobody, man."  He admitted knowing Collier and his reputation for
26       shorting customers, including Primas, but Primas claimed Collier

                                              7

would make good on deals if people complained, as Primas had done.  He saw Collier that night in the alley.  He claimed that years before he had seen a smaller person try to rob Big Rick, who rushed the culprit.

At one point Woodward mentioned how precious life was and "You only get one shot.  [A.]  Man, I don't I don't even what to talk no more.  [Q.]  All right.  [A.]  I don't even want to talk about nothing no more."  Woodward then said he would talk for awhile "and I'll run some things by you?  [A.]  Yeah."  After that, Primas did not hesitate to make remarks or answer questions, sometimes with long digressions.

He mentioned that he had been at a liquor store with his "partners," Hall and Watts, who were going to a party, and felt this was why rumors connected him to the killing.  He then said he actually spoke with Collier by the alley.  He also said he dropped the other men off "Right on El Limon" and that Watts had left his cell phone in Primas's car.  Throughout it is apparent that his answers are freely given and he is at ease with Woodward, e.g., sometimes laughing.  Towards the end he refused to tell Woodward who he had seen at Collier's house in the past, but in context he did not say he wanted to stop talking altogether.  He insisted throughout that he did not kill anybody.

On January 3, 2001, Woodward again interviewed Primas, who was still in custody, but not on murder charges.  Primas said he had already spoken to a public defender that day, and was considering having his grandparents hire a specific private lawyer the family had used before, to defend Primas on the drug charge.  He wanted to see whether the public defender was a "truck," meaning "dump truck."  (See <u>People v. Huffman</u> (1977) 71 Cal.App.3d 63, 70, fn. 2.)

Woodward told Primas he wanted to talk about the killing and he had already talked to Hall and Watts.  He emphasized that, like the first time, Primas could stop the questioning any time.  Primas was upset that his name kept coming up and he kept hearing rumors about what he had done and said "I don't even want to talk about it man," adding that he was tired of hearing these things and stressed out about it.  Woodward reiterated that Primas could just listen and could stop talking any time, and Primas said "Okay."  Woodward then read the <u>Miranda</u> rights.  By head movements Primas indicated he understood and had no problem talking about the case.

Woodward told him that after the first interview he talked to various people, including Hall and Watts and he wanted to talk to people who had been at the scene.  Hall had identified Primas as the one who called Collier that night, using Watt's mobile phone.  During most of this time, Primas responded with "Uh-huh" in a noncommittal way.  When Woodward said that he had heard "that

8

you were pissed off from Rick skimming on you" Primas laughed. Woodward said "I got to run it by you because I want you to hear this information. [A.] Yeah. That's cool." After a while Woodward explained that he had heard Hall had revealed Primas's identity and the event did not happen as planned. During this time Primas mostly answered with "Yeah" or "Uh-huh" in a noncommittal way. But when pressed Primas said he did nothing. When Woodward mentioned information from a "person that's very close to you" Primas identified the person as his girlfriend. Woodward urged Primas to start telling the truth. Primas said "I want to understand why ... everybody think[s] I killed somebody. I ain't did nothing."

Shortly thereafter Woodward said he thought Primas had not been completely honest and it did not take "a rocket scientist to figure that out." He said "you're going to be left out in left field and these two guys are going to be saying, well ... we told the truth." Primas asked what charges he faced and when Woodward told him murder he said "Okay. I don't have a problem with that. I didn't kill nobody. You said you go-[Q.] But did you understand me? I'm not ... talking about ... you personally killing anybody. I never said that at any point in time." When Primas asked for an explanation, Woodward told him that "you had just as much involvement as [Hall] and [Watts] did." Primas later said, "But what I don't understand is where do you guys come off charging people with murder when they didn't do murder." Eventually, after Woodward explained that he had detailed information from the other men, Primas asked if he could call his grandparents and "if possible" his girlfriend; "if you grant me those two things, then we'll talk."

Woodward indicated he could arrange a telephone call to the grandparents and that he could ask Hicks if she wanted to receive a call from Primas, although he added that she was "pretty scared." At this point Primas said "Okay. Man, damn, I didn't kill him. I want to say that first. I didn't kill nobody." Then he explained the plan was a strong-arm robbery with no guns and he made other incriminating statements.

The trial court found Primas's statements after being <u>Mirandized</u> and stating "I didn't kill nobody" were admissible because he thereby waived his right to silence. The court excluded everything after Primas indicated a desire for counsel.

On appeal, Primas asserts that Woodward violated his rights on December 29, 2000. He then claims the trial court "failed to address" his invocations on that date "and the legal impact of those earlier invocations upon the admissibility of the January 3 interview." He also claims he invoked his right to stop questioning earlier than the trial court found during the second interview. We reject both claims.

Primas's first claim hinges on snippets of the first transcript.  For example, "I don't even want to talk to you guys, man.  I don't have nothing to say" and "I don't even want to talk no more" and "I don't want to even talk-that's why I told you I didn't want to talk about this" and so forth.  These statements were ambiguous in context, because Primas continued to talk.  This is reflected vividly on the videotape of this interrogation, exhibit No. 3, which shows Primas's body language and demeanor.  For example, at one point his statement about not wanting to talk further is a reflection of his evident sadness at Collier's death, not a desire to stop talking in general.  Also, at times he pointedly, but politely, refused to talk about specific things, apparently connected with the pending drug charges, but even then he continues to smile and banter with Woodward.  Throughout the interrogation, the videotape shows that he is open, sometimes eager to talk, and has no hesitation whatsoever in continuing the conversation.  Thus, to the extent the cold transcript shows a desire to stop all talking, the videotape shows that is not what Primas meant.  He wanted to talk.

Further, the Miranda warnings given days later obviate his claim that the second interview was tainted; a Miranda violation, simpliciter, does not establish coercion, "and subsequent voluntary statements are not subject to exclusion as the tainted product of the Miranda violation."  (People v. Torres (1989) 213 Cal.App.3d 1248, 1254-1255; see Oregon v. Elstad (1985) 470 U.S. 298 [84 L.Ed.2d 222]; People v. Bradford (1997) 14 Cal.4th 1005, 1039.)  Nor was either interrogation, or both considered together, "relentless" as Primas claims.

After briefing was completed the United States Supreme Court issued its decision in Missouri v. Seibert (2004) [542 U.S. 600] [124 S.Ct. 2601], which held that the practice of eliciting incriminating admissions, Mirandizing the suspect, then immediately re-eliciting admissions did not comport with Miranda.  According to Justice Kennedy's concurrence, required to make up a majority, there must be some curative steps taken in between, and as an example he posited that "a substantial break in time and circumstances between the pre-warning statement and the Miranda warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn."  (Id., conc. Opn. Of Kennedy, J., typed slip opn. at p. 5.)

The two interrogations were several days apart.  That lengthy passage of time satisfies the concern addressed in Seibert, which was to avoid near-simultaneous pre- and post-warning interrogations, "integrated and proximately conducted questioning" or "midstream recitations of warnings."  (Seibert, supra, typed slip opn. at pp. 1, 12.)

/////

10

Similarly, Primas points to ambiguous parts of the second interview to claim he invoked his right to silence.  Some were made while Woodward was simply trying to read the <u>Miranda</u> warnings, such as "I don't even have no questions man.  I told ... everything that I know" and "I don't even want to talk about it, man."  But eventually he allowed Woodward to read the warnings, and then he listened while Woodward discussed the case, and for a while denied any responsibility, or made noncommittal noises and responses.  Eventually, after Woodward alluded to Hicks's assistance (without using her name) Primas began answering questions freely.  Appellate counsel does not point to any instance after the <u>Miranda</u> warnings were issued and before the incriminating statements were made when Primas said he did not want to talk.

When reviewing a trial court's ruling on a <u>Miranda</u> issue, we accept as true the historical facts supported by substantial evidence, and give great weight to the trial court's conclusion on voluntariness.  (<u>People v. Whitson</u> (1998) 17 Cal.4th 229, 248.)  A waiver may be implied from all the circumstances.  (<u>Id.</u> at pp. 246-248.)  "Once the defendant has been informed of his rights, and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows of his rights and chooses not to exercise them."  (<u>People v. Johnson</u> (1969) 70 Cal.2d 514, 558, followed in <u>People v. Sully</u> (1991) 53 Cal.3d 1195, 1233 [<u>Sully</u> understood rights, answered questions].)  For example, in <u>U.S. v. Frankson</u> (4th Cir.1996) 83 F.3d 79, Frankson said he understood his rights and answered questions; hours later, he answered more.  The court stated the general rule that "a defendant's 'subsequent willingness to answer questions after acknowledging [his] <u>Miranda</u> rights is sufficient to constitute an implied waiver.'"  "Even though Frankson never 'formally' waived his rights, such cooperation, when coupled with his acknowledgment of his <u>Miranda</u> rights, constituted a valid waiver."  (<u>Id.</u> at pp. 82-83.)  The same is true here.

We find no exercise by Primas of his right to remain silent (terminate the interview) before he made the admissions which were introduced into evidence against him at trial.  "Law enforcement officers are not required to terminate an interrogation unless the invocation of the right to remain silent is unambiguous."  (<u>Medina v. Singletary</u> (11th Cir.1995) 59 F.3d 1095, 1100.)  "'A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.'"  (<u>Ibid.</u>; <u>see</u> <u>Davis v. United States</u> (1994) 512 U.S. 452, 459 [129 L.Ed.2d 362, 371] ["suspect must unambiguously request counsel"] (<u>Davis</u>); <u>United States v. Johnson</u> (8th Cir.1995) 56 F.3d 947, 955 ["must indicate 'a clear, consistent expression of a desire to remain silent'"].)

Defendant contends he did not initiate the second interview.  He relies on Edwards v. Arizona (1981) 451 U.S. 477 [68 L.Ed.2d 378] and its progeny, which hold that after a suspect has invoked the right to counsel, officers may not initiate another interview, but must wait for the suspect to reinitiate any dialogue.  (See McNeil v. Wisconsin (1991) 501 U.S. 171, 177 [115 L.Ed.2d 158, 167-168; People v. Storm (2002) 28 Cal.4th 1007, 1023-1024.)  Nowhere does counsel point to any statement in the first interview which even arguably qualifies as a request for counsel.  Further, even extending Edwards to invocations of the right to silence, as Primas impliedly does, such invocations must be unambiguous, as indicated above.  Primas never clearly indicated a desire to stop talking to Woodward.  There was no invocation pertaining to Woodward which would trigger the sought-for expanded rule.

Primas has failed to show the trial court erred in ruling on his pretrial motion to suppress.

(Opinion at 13-23 (emphases in original).)

## 2. Applicable Law

"The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. at 444.  To this end, custodial interrogation must be preceded by advice to the potential defendant that he has the right to consult with a lawyer, the right to remain silent and that anything he says can be used in evidence against him.  Id. at 473-74.  Miranda warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." Oregon v. Elstad, 470 U.S. 298, 305 (1985) (quoting Michigan v. Tucker, 417 U.S. 433, 444 (1974)).

If law enforcement officers violate the dictates of Miranda when conducting an interrogation, the state may not use any statement by the suspect in its case in chief.  Miranda, 384 U.S. at 476-79; see also Elstad, 470 U.S. at 307.  However, a defendant's incriminating statements obtained in violation of Miranda may be introduced for the purpose of impeaching the credibility of the defendant's own testimony at trial if the defendant's statements were voluntary and reliable.  Harris v. New York, 401 U.S. 222, 225 (1971).  This is because "[t]he shield

12

provided by <u>Miranda</u> cannot be perverted into a license to use perjury by way of a defense, free

from the risk of confrontation with prior inconsistent utterances." <u>Id.</u> at 226.

Unlike evidence obtained through a Fourth Amendment violation, the <u>Miranda</u>

presumption does not require that the "fruits [of unlawfully obtained confessions] be discarded as

inherently tainted." <u>Elstad</u>, 470 U.S. at 307.

> It is an unwarranted extension of <u>Miranda</u> to hold that a simple
> failure to administer the warnings, unaccompanied by any actual
> coercion or other circumstances calculated to undermine the
> suspect's ability to exercise his free will, so taints the investigatory
> process that a subsequent voluntary and informed waiver is
> ineffective for some indeterminate period.  Though <u>Miranda</u>
> requires that the unwarned admission must be suppressed, the
> admissibility of any subsequent statement should turn in these
> circumstances solely on whether it is knowingly and voluntarily
> made.

<u>Id.</u> at 309.  The fruit of the poisonous tree doctrine operates in the Fifth Amendment context as

follows: if the defendant's pre-<u>Miranda</u> statement was coerced in violation of the Fifth

Amendment, then the court must suppress the defendant's post-<u>Miranda</u> statement unless the

post-<u>Miranda</u> statement was sufficiently attenuated from the coercion to remove any "taint."  <u>See</u>

<u>United States v. Shi</u>, 525 F.3d 709, 726-27 (9th Cir. 2008); <u>United States v. Wauneka</u>, 770 F.2d

1434, 1440 (9th Cir. 1985).  However, "[i]f . . . the prior statement was voluntary in the sense

that it was not coerced in violation of the [F]ifth [A]mendment, though obtained in technical

violation of the <u>Miranda</u> requirements, the court should suppress the statement given after the

<u>Miranda</u> warning only if the court finds that the subsequent statement was not voluntarily made."

<u>Elstad</u>, 470 U.S. at 318.  "Thus under <u>Elstad</u>, if the prewarning statement was voluntary (or if

involuntary, the change in time and circumstances dissipated the taint), then the postwarning

confession is admissible unless it was involuntarily made despite the <u>Miranda</u> warning." <u>United</u>

<u>States v. Williams</u>, 435 F.3d 1148, 1153 (9th Cir. 2006).  <u>See also</u> <u>Medeiros v. Shimoda</u>, 889

F.2d 819, 824-25 (9th Cir. 1989) (although defendant's first statements were suppressed for

/////

1   failure to give <u>Miranda</u> warnings prior to custodial interrogation, second statement made by

2   defendant was not suppressed because it was voluntary).

3          In <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), the United States Supreme Court

4   held that a trial court must suppress a confession obtained after a <u>Miranda</u> warning if it was

5   obtained during a "two-step" interrogation where the police deliberately withheld the <u>Miranda</u>

6   warning until the suspect confessed, followed by a <u>Miranda</u> warning and a repetition of the

7   confession previously given. <u>Id.</u> at 604. Where the interrogating officers "*deliberately* employ a

8   two-step interrogation to obtain a confession and where separations of time and circumstance and

9   additional curative warnings are absent or fail to apprise a reasonable person in the suspect's

10  shoes of his rights, the trial court should suppress the confession." <u>Williams</u>, 435 F.3d at 1158

11  (emphasis in original). If the two-step method is not undertaken deliberately, "the post-warning

12  statements are admissible if voluntarily made." <u>United States v. Narvaez-Gomez</u>, 489 F.3d 970,

13  974 (9th Cir. 2007).

14         The Fourteenth Amendment to the United States Constitution demands that

15  confessions be made voluntarily. <u>See</u> <u>Lego v. Twomey</u>, 404 U.S. 477, 483-85 (1972). A

16  confession is voluntary only if it is "'the product of a rational intellect and a free will.'"

17  <u>Medeiros</u>, 889 F.2d at 823 (quoting <u>Townsend v. Sain</u>, 372 U.S. 293, 307 (1963)). <u>See also</u>

18  <u>Blackburn v. Alabama</u>, 361 U.S. 199, 208 (1960). "The line of distinction is that at which

19  governing self-direction is lost and compulsion, of whatever nature or however infused, propels

20  or helps to propel the confession." <u>Collazo v. Estelle</u>, 940 F.2d 411, 416 (9th Cir. 1991) (en

21  banc) (quoting <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961)). <u>See also</u> <u>Pollard v Galaza</u>,

22  290 F.3d 1030, 1033 (9th Cir. 2002) ("Under the Fourteenth Amendment, a confession is

23  involuntary only if the police use coercive means to undermine the suspect's ability to exercise

24  his free will."). In the end, the court must determine under the totality of the circumstances

25  whether "the government obtained the statement by physical or psychological coercion or by

26  improper inducement so that the suspect's will was overborne." <u>Beaty v. Stewart</u>, 303 F.3d 975,

992 (9th Cir. 2002) (quoting <u>United States v. Leon Guerrero</u>, 847 F.2d 1363, 1366 (9th Cir.

1988)).  <u>See</u> <u>also</u> <u>Hutto v. Ross</u>, 429 U.S. 28, 30 (1976); <u>Haynes v. Washington</u>, 373 U.S. 503,

513-14 (1963).

        3.  <u>Analysis</u>

        The trial court held a hearing on petitioner's motion to suppress the statements he

made to police at both interviews.  (Lodged Document 1, Clerk's Transcript on Appeal

(hereinafter CT) at 258-260.)  The court ruled that petitioner's statements at the December 29,

2000 interview were obtained in violation of <u>Miranda</u> and therefore were inadmissible in the

prosecution's case-in-chief.  (Lodged Document 2, Reporter's Transcript on Appeal (hereinafter

RT) at 197.)[3]  The court did not specifically address petitioner's alleged invocations of his right

to remain silent during this interview.  (<u>Id.</u>)  However, it found that petitioner's statements were

"uncoerced and voluntary" and were therefore admissible for purposes of impeachment.  (<u>Id.</u>)

Because petitioner did not testify, none of these statements were introduced at his trial.  (<u>See</u>

Opinion at 14.)

        With respect to the interrogation of January 3, 2001, the trial court concluded that

petitioner's protestations prior to receiving <u>Miranda</u> warnings were "ambiguous and equivocal"

and did not constitute an invocation of his right to remain silent.  (RT 199.)  The court found that

after receiving <u>Miranda</u> warnings on January 3, petitioner did not waive his right to remain silent

until he began to talk about his role in the killing.[4]  (RT 201-202.)  The court allowed into

---

    [3]  While petitioner was <u>Mirandized</u> at the end of the December 29 interview, it was in the
context of a separate discussion related to a drug possession he understood would be used in a
probation violation proceeding.  (CT 1428-1429.)

    [4]  Specifically, the trial court found that petitioner waived his right to remain silent when
he made the following statements:

        Okay.  Man, damn, I didn't kill him.  I want to say that first.  I
        didn't kill nobody.  I didn't.  I didn't kill nobody. . . . And, um –
        man, I don't know – I don't know why it happened.  I don't know
        why it happened.  I didn't – I didn't kill him.  I don't know why he

1   evidence all of petitioner's statements that occurred after he waived his right to remain silent but

2   before he asserted his right to counsel. (RT 201-203, 888-893; CT 1208-1253.[5])

3         As explained above, the California Court of Appeal concluded that petitioner's

4   statements at the December 29, 2000 interrogation were voluntary and therefore did not "taint"

5   the second interrogation. (Opinion at 18-19.) The court also concluded petitioner did not invoke

6   his right to silence during the December interrogation because the videotape reflected petitioner

7   "wanted to talk" and did not evidence "a desire to stop talking" in general. (Id. at 18-19, 22-23.)

8   With regard to the second interrogation on January 3, 2001, the appellate court concluded that

9   petitioner's statements were voluntary, that he did not unambiguously invoke his right to silence

10   prior to receiving Miranda warnings, and that the interrogation was not the product of the

11   unlawful "two-step" process disapproved in Missouri v. Seibert. (Id. at 18-23.)

12         After reviewing the digital videotapes and written transcriptions of petitioner's

13   two police interrogations, this court agrees with the conclusion reached by the state appellate and

14   trial courts that petitioner's statements from the second interrogation were properly admitted at

15   his trial. Although the December 29, 2000 interrogation was obtained in violation of the

16   Miranda requirements, there is no evidence that petitioner's statements were involuntary or

17   coerced. Further, the first interrogation did not lead to any incriminating statements and was

18   separated by several days from the second interrogation. These circumstances removed any

19   possible "taint" from the later confession.

20   _____

21                   got killed. I didn't – I don't know why he got killed. It wasn't –
                  that wasn't – that wasn't supposed to even be – I didn't – man, that

22                   wasn't supposed to be there. That wasn't supposed to happen. . . .

23   (CT 1482-1483.)

24       [5] The unedited version of the interview transcript discloses that, as the interview was
   winding down and petitioner was asked about possible plea deals, he suggested to the detective

25   that "you can talk to [the deputy district attorney] tomorrow and tell him what I know. I have a
   lawyer present with me tomorrow." (CT 1534-1535.) This is the first time petitioner mentions a

26   lawyer during the interview.

1        With regard to the second interrogation on January 3, 2001, the statements

2   admitted into evidence at petitioner's trial were made after petitioner received <u>Miranda</u> warnings

3   and waived his right to silence by beginning to confess, and before he said something that could

4   be construed as a desire to have counsel present.  There is no evidence that those statements were

5   involuntary, and this court rejects petitioner's argument that the questioning was "relentless" or

6   that it caused his will to be overborne.  Although petitioner does say on occasion he wants to call

7   his grandparents, or protests that he does not want to get into certain details, he then continues

8   talking without any urging.  Even if on some level he did not want to talk, he continued to

9   volunteer information without any indication he was doing so under duress.  Because petitioner's

10  confession was obtained pursuant to a voluntary and knowing waiver of his constitutional rights,

11  there is no constitutional impediment to admitting the confession into evidence.  Put another

12  way, even if <u>Miranda</u> violations occurred during the first day of petitioner's interrogation, any

13  possible "taint" was dissipated prior to petitioner's confession by the passage of time, the

14  administration of <u>Miranda</u> warnings prior to renewed questioning regarding "Big Rick's" death,

15  and petitioner's waiver of his constitutional rights.  <u>See</u> <u>Elstad</u>, 470 U.S. at 309-11 ("we hold

16  today that a suspect who has once responded to unwarned yet uncoercive questioning is not

17  thereby disabled from waiving his rights and confessing after he has been given the requisite

18  <u>Miranda</u> warnings").

19       The state appellate court concluded petitioner did not invoke his right to remain

20  silent prior to receiving <u>Miranda</u> warnings at the beginning of the January 3, 2001 interrogation.[6]

21

22       [6] Specifically, petitioner made the following statements:

23       I hear about all that in – in the jailhouse.  I go to court and hear
         about it.  Man, you know – man, it's – I don't even want to talk
24       about it, man.  I'm . . . I stress in there over this shit.  I ain't did
         nothing.  Man, I'm tired of hearing it.

25
    (CT 1440.)
26

1    This conclusion is consistent with this court's review of the videotape.  Petitioner's words,

2    viewed in context, do not imply a request to terminate the entire interview.  Rather, petitioner

3    appeared to be explaining that he was tired of hearing about his involvement in the murder.

4    Further, after making these statements, petitioner immediately agreed to continue with the

5    interrogation.  Under the circumstances, it was not at all clear petitioner was requesting to

6    terminate the questioning.  See Arnold v. Runnels, 421 F.3d 859, 866 (9th Cir. 2005) (an

7    invocation of the right to remain silent "must not be 'so equivocal or unclear that 'a reasonable

8    officer in light of the circumstances would have understood only that the suspect *might* be

9    invoking' his right to remain silent." (quoting Davis, 512 U.S. at 459 (emphasis in original));

10   Bradley v. Meachum, 918 F.2d 338, 342 (2d Cir. 1990) (quoting United States v. Goodwin, 470

11   F.2d 893, 902 (5th Cir. 1972); in order to determine whether a suspect invoked his Fifth

12   Amendment rights, "a court should examine the entire context in which the claimant spoke").

13           The California Court of Appeal also concluded petitioner's statements did not fall

14   within the ruling of Missouri v. Seibert.  This court agrees.  First, unlike the situation in Seibert,

15   petitioner did not confess to committing the crime at the first interrogation, but steadfastly denied

16   he was involved.  Further, there is no evidence in the record that the police deliberately withheld

17   the Miranda warnings in order to undermine Miranda, or that they employed the two-step tactic

18   "to render Miranda warnings ineffective by waiting for a particularly opportune time to give

19   them, after the suspect has already confessed."  Seibert, 542 U.S. at 611.  Rather, the

20   interrogating officer testified at the suppression hearing that he did not give petitioner Miranda

21   warnings at the December 29, 2000 interview because he was still attempting to clarify whether

22   petitioner was "a victim, a witness, or a suspect."  (RT 127.)  Even if the officer did deliberately

23   withhold Miranda warnings, the four day passage of time between the two interrogations satisfied

24   the concern expressed in Seibert to avoid "near-simultaneous pre- and post- warning

25   _____

26

interrogations," and eliminated any serious doubt that petitioner would misunderstand the import of the <u>Miranda</u> warning because he had just confessed.  <u>Seibert</u>, 542 U.S. at 622 ("a substantial break in time and circumstances between the prewarning statement and the <u>Miranda</u> warning may suffice in most circumstances").  This delay also would significantly lessen the possibility petitioner would believe the "further questioning was a mere continuation of the earlier questions."  <u>Id.</u> at 616-17.

Petitioner's argument that his interrogation on January 3, 2001 violated the "no recontact rule" of <u>Edwards v. Arizona</u> should also be rejected.  In <u>Edwards</u>, the Supreme Court established a "bright-line rule" that all questioning must cease once a request for counsel is made. 451 U.S. at 477.  Accordingly, if the accused clearly invokes his right to have counsel present, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and then (b) knowingly and intelligently waived the right he had invoked.  <u>Id.</u> at 485-86.  In imposing these rules, the <u>Edwards</u> court specifically noted that "additional safeguards are necessary when the accused asks for counsel."  <u>Id.</u> at 484.  <u>See</u> <u>also</u> <u>United States v. Bosby</u>,  675 F.2d 1174, 1182 (11th Cir. 1982) (noting that "on assertion of right to counsel, law enforcement officials cannot subject a suspect to further questioning until an attorney has been appointed for him and he has been accorded the opportunity to consult," but "[w]here a defendant asserts his right to remain silent, law enforcement officials are required to cease custodial questioning but may resume the interrogation at some later time").  Because there is no evidence petitioner requested that counsel be present at the December interrogation, the "no contact" rule set forth in <u>Edwards</u> is inapplicable and does not dictate the result in this case.[7]

/////

/////

---

[7]   Petitioner also cites <u>Jackson v. Giurbino</u>, 364 F.3d 1002 (9th Cir. 2004) in support of his claims.  (Pet., Ex. A at 2.)  In <u>Jackson</u>, unlike here, the habeas petitioner was not given <u>Miranda</u> warnings prior to the interrogation that resulted in his confession.  <u>Id.</u> at 1009. Accordingly, <u>Jackson</u> is factually distinguishable.

1    For the foregoing reasons, the decision of the California Court of Appeal with

2 regard to petitioner's claims that his confession was improperly admitted into evidence at his trial

3 is not contrary to or an unreasonable application of United States Supreme Court authority.

4 Accordingly, petitioner is not entitled to relief on these claims.

5    B. Motions for Substitute Counsel

6    Petitioner also claims the trial court failed to conduct an adequate hearing on his

7 motions for substitute counsel.  (Pet. at 6.)  Petitioner's claim is stated, in full, as follows:

8    Trial court erred in denying repeated Marsden motions for
      substitutions of counsel.  I filed at least 4 Marsden motions over
9    the course of my incarceration in Sacramento Co. Jail.  During trial
      I filed a Faretta motion.  My lawyer never devised a strategy.
10   Never called or contacted witnesses & didn't present evidence on
      my behalf during trial.  He relied on a suppression motion (to
11   suppress statement) only.  I gave the judge these same reasons, but
      I was refused each time.

12

13 (Id.)[8]

14    1. State Court Ruling

15    The California Court of Appeal described the background to this claim and its

16 ruling thereon as follows:

17    I. Primas's Motions Regarding Trial Counsel

18    Primas contends the trial court mishandled his motions to change
      counsel.  The Attorney General concedes that at one point a judge
19   may have applied the wrong standard to one of Primas's motions,
      but argues this was harmless.  We reject Primas's claim of
20   reversible error.

21    A Marsden motion provides a mechanism for an indigent
      defendant to have court-appointed counsel replaced if that attorney
22   is incompetent or there is an irreconcilable breakdown in the
      attorney-client relationship such that incompetent representation is
23   likely to result.  (People v. Marsden (1970) 2 Cal.3d 118; see
      People v. Earp (1999) 20 Cal.4th 826, 876.)  A trial court faced

24

_____

25    [8] Petitioner does not challenge the trial court's denial of his Faretta motion in this habeas
petition.  His statement that he "filed a Faretta motion" during trial does not constitute a
26 challenge to the ruling on that motion.  Accordingly, this court will not address a Faretta claim.

with such a motion must conduct an in camera hearing and allow the defendant to explain the problems with counsel, and generally will allow counsel to respond to these complaints. The result of a successful <u>Marsden</u> motion is that the defendant must be given a new attorney paid for by the state.

A <u>Faretta</u> motion is a mechanism for any defendant to exercise the right of self-representation. (<u>Faretta v. California</u> (1975) 422 U.S. 806 [45 L.Ed.2d 562].) A trial court faced with such a motion must determine whether it is timely, that is, not brought so late as to unduly interfere with the trial, and must make an inquiry to determine the defendant's competence to waive counsel. (<u>See</u> <u>People v. Nauton</u> (1994) 29 Cal.App.4th 976, 979-981.) The result of a successful <u>Faretta</u> motion is the attorney is discharged (though counsel may remain as an advisor) and the defendant thereafter represents himself.

The motions may overlap. A defendant who loses a <u>Marsden</u> motion may make a <u>Faretta</u> motion as a last-ditch effort to get rid of counsel, or juggle the motions simply to frustrate the proceedings. (<u>See</u>, <u>e.g.</u>, <u>People v. Horton</u> (1995) 11 Cal.4th 1068, 1111; <u>People v. Nicholson</u> (1994) 24 Cal.App.4th 584, 593, fn. 5; <u>People v. Williams</u> (1990) 220 Cal.App.3d 1165, 1170.) But they are distinct motions. (<u>See</u> Cal. Judges Benchbook, Criminal Pretrial Proceedings (CJER 1991) §§ 1:42-1.53; Cal.Criminal Law Practice and Procedure (Cont.Ed.Bar 6th ed.2002) §§ 5.3, 5.7-5.10, 5.25-5.27.)

Judge DeAlba denied Primas's first <u>Marsden</u> motion, stating at one point that if he granted the motion Primas would have to represent himself. The Attorney General concedes that Judge DeAlba misunderstood the result of a successful <u>Marsden</u> motion. We think the Attorney General's concession is overly broad. Although snippets of the transcript suggest the trial court was incorrect, when read in full it appears Judge DeAlba understood the law. Where the court erred was in colloquy with the defendant, while "softening the blow" of his ruling. We explain:

On February 25, 2002, defendant Primas made his first <u>Marsden</u> motion, stating a lack of communication with appointed counsel, and seeking appointment of new counsel. Judge DeAlba asked if he knew what a <u>Marsden</u> motion was, and defendant said "To relieve me of counsel, to appoint a new one." The court ascertained from counsel that trial was three months off and counsel's strategy hinged on suppression of pretrial statements Primas made to the police. Then, after establishing on the record that counsel appeared to be competent and was pursuing appropriate steps in the case, the court told Primas his counsel was competent, had been busy with other cases, but was now focused on this case, concluding: "It seems to me that you still have the potential to work with him. You may not be 100 percent satisfied,

and I understand that for a person in your situation.  [¶]  But my-your options are if I discharge this man, you're going to represent yourself at this point.  Is that what you want to do?"

Contrary to the view of the parties, our reading of this record, in context, shows Judge DeAlba ruled against the <u>Marsden</u> motion on the merits and was explaining to the lay defendant that the only way to get rid of counsel was to go pro per., i.e., make a <u>Faretta</u> motion.

Shortly after that passage the court stated "I am going to deny it without prejudice so that if in two months or whatever reasonable amount of time you feel you are still at square one, then that way you can bring the motion back."  The court later made a comment about not finding a reason "where I ought to say he's gone and I will let you represent yourself" and "Unless you go out and hire a lawyer, you are going to end up representing yourself.  And if that's what you want to do, then you will have that privilege.  [¶]  And when we get a little closer, but right now, let's wait to see that-make sure in your own mind you get off of square one."  This passage does not show conflation of <u>Faretta</u> with <u>Marsden</u>.  In context, Judge DeAlba denied the motion because nothing showed incompetence or a serious irreconcilable breakdown in the attorney-client relationship likely to lead to incompetent representation.  Therefore, if defendant wanted new counsel he was going to have to hire one, or represent himself.

Even if the judge was confused about the remedy, he denied the <u>Marsden</u> motion for valid reasons.

On August 29, 2002, after the suppression motion was denied, Primas told the trial judge (Judge Burger-Plavan) he was still unhappy and wanted to represent himself.  The court inquired whether he was making a <u>Faretta</u> or a <u>Marsden</u> motion and eventually defendant said "And I am not saying my representation is inadequate.  But I just feel I am still at the same place I was at six, seven months ago down the road."  This passage shows defendant Primas was <u>not</u> asserting that counsel was incompetent under <u>Marsden</u>.  The <u>Faretta</u> motion was denied as untimely, and that ruling is not challenged on appeal.  On September 3, 2002, the trial judge confirmed that defendant had not been making a second <u>Marsden</u> motion.

On September 16, 2002, during trial, Primas complained that trial counsel had not contacted witnesses who would have effectively impeached Hicks, his former girlfriend.  Trial counsel explained that those witnesses would not have been helpful and that impeaching Hicks was "fraught with potential problems" because it might open the door to Primas's parolee status, drug use and jail time.  Trial counsel agreed to recontact his investigator regarding some of these witnesses.

22

This second Marsden motion was denied. Judge Burger-Plavan stated counsel had done "an excellent job" of cross-examining Hicks and showing her bias against her former boyfriend, defendant Primas, and that generally he was doing a good job representing Primas.

Primas concedes that a trial court exercises discretion when ruling on a Marsden motion but argues the facts show an "irreconcilable conflict ... of such a magnitude that the trial court abused its discretion in failing to substitute counsel."

All the record shows is that defense counsel did not agree with Primas's view about what witnesses should be called and how Hicks should be impeached. Disagreement over tactics does not show an irreconcilable conflict. (See People v. Barnett (1998) 17 Cal.4th 1044, 1092 (Barnett); People v. Williams (1970) 2 Cal.3d 894, 905-906.) The fact counsel called no witnesses does not show incompetence; that is an accepted way to hold the People to their burden. Nothing in the record suggests any witnesses that Primas claims should have been called would have helped him. That Primas reiterated his complaints in multiple motions adds no weight to them.

Primas claims that Judge DeAlba's early misstatement about having to represent himself if he prevailed at a Marsden motion "chilled" him from making further motions. This claim about his intent is unsupported by the record and is undermined by the fact that he made further motions, negating the idea that he was deterred.

In the reply brief Primas emphasizes that two of the people he had mentioned to counsel "were either not contacted at all or belatedly contacted just shortly before the defense rested without having called any witnesses whatsoever." However, a trial attorney is not required to contact all possible witnesses. (Barnett, supra, 17 Cal.4th at p. 1111.) Nothing in the record shows these witnesses were important. They supposedly might have contradicted Hicks on some points. But counsel pointed out in the trial court that "I don't know how any of these witnesses would be able to specifically contradict what Ms. Hicks said because Ms. Hicks has testified that essentially my client told her these things when no one else was around.... I just don't-they're just not witnesses that are going to be helpful to his case." In denying the second Marsden motion the trial court found counsel had done "an excellent job" and we see nothing in the record to disturb that finding.

There was no abuse of discretion as to these motions.

(Opinion at 7-13 (emphasis in original).)

/////

1          2. <u>Legal Standards</u>

2          Where a defendant is proceeding with the assistance of counsel, he may move to

3   dismiss or substitute his appointed or retained attorney.  The grant or denial of such a motion

4   may depend on a number of factors including the timeliness of the motion, the adequacy of the

5   court's inquiry and the nature of the conflict between the defendant and current counsel.  <u>United</u>

6   <u>States v. Prime</u>, 431 F.3d 1147, 1155 n.4 (9th Cir. 2005) (and cases cited therein); <u>United States</u>

7   <u>v. Nguyen</u>, 262 F.3d 998, 1004 (9th Cir. 2001).  The Ninth Circuit has ruled that in assessing a

8   <u>Marsden</u> claim in the context of a federal habeas corpus proceeding, the Sixth Amendment

9   requires only "an appropriate inquiry into the grounds of such a motion, and that the matter be

10  resolved on the merits before the case goes forward."  <u>Schell v. Witek</u>, 218 F.3d 1017, 1025 (9th

11  Cir. 2000) (en banc).

12          A federal court conducting habeas review must determine whether the state trial

13  court's denial of the <u>Marsden</u> motion "actually violated [the petitioner's] constitutional rights in

14  that the conflict between [the defendant] and his attorney had become so great that it resulted in a

15  total lack of communication or other significant impediment that resulted in turn in an

16  attorney-client relationship that fell short of that required by the Sixth Amendment."  <u>Schell</u>, 218

17  F.3d at 1026.  Although a criminal defendant is entitled to "counsel acting in the role of an

18  advocate," <u>United States v. Cronic</u>, 466 U.S. 648, 656-67 (1984) (quoting <u>Anders v. California</u>,

19  386 U.S. 738, 743 (1967)), there is no automatic right to new counsel simply because a defendant

20  is dissatisfied.  <u>Jackson v. Ylst</u>, 921 F.2d 882, 888 (9th Cir. 1990).  A defendant has no right to a

21  meaningful relationship with counsel; rather, he has a right to an ability to communicate.

22  <u>LaGrand v. Stewart</u>, 133 F.3d 1253, 1276-77 (9th Cir. 1998)  "[T]he essential aim of the [Sixth]

23  Amendment is to guarantee an effective advocate for each criminal defendant rather than to

24  ensure that a defendant will inexorably be represented by the lawyer whom he prefers."  <u>Wheat v.</u>

25  <u>United States</u>, 486 U.S. 153, 159 (1988).

26  /////

1        3. Analysis

2        As explained below, the record supports the state appellate court's conclusion that

3  petitioner's Marsden hearings and the trial court's denial of petitioner's requests for new counsel

4  complied with the Sixth Amendment. See Schell, 218 F.3d at 1025.  As described by the

5  California Court of Appeal, the trial court conducted a complete and thorough hearing on

6  petitioner's complaints.  The trial court addressed petitioner's concerns but ultimately concluded

7  that petitioner was being adequately represented.  The record does not reveal a conflict or a total

8  lack of communication between petitioner and his trial counsel.

9        At the first Marsden hearing held on February 25, 2002, petitioner complained

10 that his trial counsel had not adequately prepared for trial, did not have an appropriate trial

11 strategy, had not conducted sufficient investigation into possible witnesses, and had not met with

12 him enough. (RT 3-6.)  Counsel explained he was working on another case and knew that

13 petitioner's trial had been put off for three months.  (RT 7.)  He stated that he planned to visit

14 petitioner with his investigator to discuss trial strategy.  (RT 14.)  Counsel also explained his

15 investigator had been trying to locate witnesses and that counsel had gone to the crime scene with

16 the investigator and had been researching a motion to suppress petitioner's confession.  (RT 8-9.)

17 Counsel stated he had not "had any problems" with petitioner and that he just needed to "see him

18 more." (RT 11.)  Petitioner conceded that his attorney was qualified and professional.  (RT 13.)

19 Ultimately, the trial court concluded that petitioner was generally dissatisfied with counsel's

20 performance and the evidence supporting his defense up to the point of the Marsden hearing, but

21 decided to give counsel more time to satisfy petitioner's concerns.  (RT 15-16.)  Without more,

22 petitioner's complaints at the February 25, 2002 hearing were insufficient to require the

23 appointment of new counsel.[9]  Schell, 218 F.3d at 1026; Nguyen, 262 F.3d at 1004.

24

25        [9] Although the judge stated at one point, erroneously, that petitioner would have to
   represent himself if his counsel were to be discharged (RT 15), it is clear the Marsden motion
26 was not denied on this basis.  As stated by the California Court of Appeal, "even if the judge was

                                    25

1          At the second hearing on August 29, 2002, petitioner complained that it appeared

2   his trial counsel had given up on the case after losing the suppression motion.  (RT 460, 465-

3   466.)  He complained his attorney did not appear to be ready for trial and that the defense

4   strategy had been limited to winning the motion to suppress.  (Id.)  Counsel explained he had not

5   given up on the case and that he would be "fighting for him as hard as I can."  (RT 462.)  The

6   trial court concluded that petitioner was making a Faretta motion for self-representation, and not

7   a Marsden motion for substitute counsel, and denied the Faretta motion because it was untimely.

8   (RT 463, 466, 468-469.)  Because petitioner is not challenging the trial court's ruling on his

9   Faretta motion, this hearing appears to be irrelevant to petitioner's claim.  However, even if

10  petitioner intended to make a Marsden motion at the hearing on August 29, 2002, it was properly

11  denied.  The trial court allowed petitioner to explain his concerns and invited counsel to respond

12  to those concerns.  Petitioner acknowledged he was not making a Marsden motion and that he

13  was "not saying my representation is inadequate."  (RT 465.)  Under these circumstances, the

14  trial court's handling of petitioner's complaints at this hearing passes constitutional muster.

15          On September 16, 2002, petitioner made another Marsden motion.  (RT 967.)  He

16  complained his trial counsel had failed to appropriately cross-examine prosecution witness Hicks

17  and had failed to interview specific witnesses who could contradict her testimony.  (RT 968-

18  973.)  Counsel explained his investigator had done her best to contact petitioner's witnesses but

19  had been unable to find anyone who could provide helpful testimony.  (RT 974.)  He also

20  explained the cross-examination of Ms. Hicks was "fraught with potential problems," because

21  she "knows a lot about Mr. Primas."  (RT 975.)  Counsel explained why he did not cross-

22  examine Hicks on some of the specific subjects petitioner had brought up.  (RT 976-977.)  The

23

24  confused about the remedy, he denied the Marsden motion for valid reasons."  (Opinion at 10.)
    Accordingly, this court does not find the trial judge's remarks dispositive.  In any event, at a later
    Marsden hearing, the trial judge asked petitioner whether he understood "that you are requesting

25  that Mr. McEwan be relieved as your attorney and that another attorney be appointed to represent
    you?"  (RT 968.)  This question reflects the trial judge understood the proper remedy upon

26  granting a Marsden motion.

1   trial court suggested, and counsel agreed, that he would have his investigator contact some of the

2   witnesses mentioned by petitioner to determine whether they could provide any helpful

3   information.  (RT 978.)  At the conclusion of the <u>Marsden</u> hearing, the trial judge stated that

4   petitioner's counsel had done an "excellent" job of cross-examining Ms. Hicks and that he was

5   doing a "very good job representing Mr. Primas."  (RT 978-980.)  The court concluded, "I find

6   that Mr. Primas has been properly represented by Mr. McEwan.  Based on Mr. McEwan's

7   performance, I have confidence that he will continue to much more than adequately and in fact

8   very well represent Mr. Primas."  (RT 980.)  The record reflects that the trial court made

9   appropriate inquiry into petitioner's complaints and reasonably determined there was no

10   irreconcilable conflict between petitioner and his trial counsel.  As both the trial and appellate

11   courts noted, defense counsel's handling of petitioner's case demonstrated he was sufficiently

12   prepared to represent petitioner adequately.

13          For the reasons stated above, the court concludes that the state court's denial of

14   petitioner's requests for new counsel was neither contrary to, nor an unreasonable application of,

15   clearly established Supreme Court law.  <u>See</u> 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S.

16   362, 412-13 (2000).  Accordingly, petitioner is not entitled to relief on his <u>Marsden</u> claims.

17          For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

18   application for a writ of habeas corpus be denied.

19          These findings and recommendations are submitted to the United States District

20   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

21   days after being served with these findings and recommendations, any party may file written

22   objections with the court and serve a copy on all parties.  Such a document should be captioned

23   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

24   /////

25   /////

26   /////

27

shall be served and filed within ten days after service of the objections.  The parties are advised

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  July 23, 2009.

_____
U.S. MAGISTRATE JUDGE

8:primas1557.hc